UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| ELIZABETH A. PLANTENGA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   4:06-CV-0089AS |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM, ORDER & OPINION

Plaintiff, Elizabeth A. Plantenga, seeks judicial review of the denial of her claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Ms. Plantenga not entitled to a period of disability nor Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Ms. Plantenga applied for DIB on June 21, 2001 (Tr. 39). This initial application was denied and the decision was not appealed (Tr. 51,67). Ms. Plantenga's date last insured was December 31, 2001 (Pl. Br. 11). On September 10, 2002, Ms. Plantenga applied once again for DIB, alleging an onset disability date of February 29, 1996 (Tr. 63-5). This application was denied, as was the application for reconsideration (Tr. 38-9, 44-6). Ms. Plantenga then requested a hearing before Administrative Law Judge Albert J. Velasquez, (the "ALJ") which was granted (Tr. 40).

The first hearing was held on July 13, 2005, wherein Ms. Plantenga was represented by

1

counsel, and Gail Corn, a vocational expert, testified (Tr. 20).  A supplemental hearing was held on February 17, 2005, during which Ms. Plantenga's friend testified (Tr. 20).  On August 13, 2005, the ALJ denied Ms. Plantenga's request for DIB (Tr. 27).  Ms. Plantenga requested review of the decision from the appeals council and was summarily denied (Tr. 7-10).  At that point, the ALJ's decision became the final decision of the Commissioner.

## I.  Background

Statement of Facts

Ms. Plantenga was forty-nine years old at the time of the ALJ's decision, had earned her high school diploma, and had earned a college degree in Elementary Education (Tr. 20).  Her past relevant work experience consisted of being a schoolteacher (Tr. 20).  She had also had experience working in a nursery school on a part-time basis (Tr.687-90).

Medical Evidence

Ms. Plantenga has reported intermittent back pain since 1983 (Tr. 197).  However, the record has been anything but consistent.  Ms. Plantenga complained of back problems in November of 1993, gave birth in February of 1996, citing no complaints, and complained of back pain in April of 1999 (Tr. 200, 202, 206).

On May 3, 2000, Ms. Plantenga visited Dr. Brown, complaining of lower back pain (Tr. 207).  On May 16, 2000, she went to the Community Health Clinic, again, complaining of lower back pain (Tr. 369).

On February 28, 2001, Ms. Plantenga had an X-ray taken of her pelvis, right hip, sacrum, and coccyx.  The findings showed degenerative changes involving the lumbo-sacral spine at L5-S1, where there were also signs of degenerative disc disease.  Ms. Plantenga's pelvis, right hip,

sacrum, and coccyx were all otherwise normal (Tr. 159).

On March 19, 2001, an MRI was taken of Ms. Plantenga's lumbar spine.  The MRI showed degenerative disc disease at L4-5 and L5-S1 associated with dehydration of the invertebral discs and loss of disc substance at L5-S1.  There was no sign neural impingement and the lumbar spine was normal (Tr. 381-2).

On May 16, 2001, Richard V. Chua, M.D., saw Ms. Plantenga and described her as well-nourished, pleasant, cooperative and in no acute distress (Tr. 174).  Findings from several tests were normal, although he noted that Ms. Plantenga had diffuse lumbosacral tenderness (Tr. 174).  Dr. Chua recommended physical therapy and continued doses of Celebrex and Ultram (Tr. 174-5).

On September 1, 2001, Luella Bangura, M.D., saw Ms. Plantenga (Tr. 297-303).  She noted that Ms. Plantenga was unable to walk on her heels due to back pain, was able to squat all the way down and rise up again without difficulty, had normal gait and station with no signs of ataxia, and had limited range of motion (Tr. 298-9).  Further, Dr. Bangura noted that there was marked tenderness in the L5-S1 area of the spine (Tr. 299).  Dr. Bangura's findings were consistent with degenerative disc disease (Tr. 301).

On October 31, 2001, Dr. Chua examined Ms. Plantenga, noting that she appeared depressed and that she continued to complain of back pain (Tr. 178).  Ms. Plantenga did not feel it wise to consider surgical treatment because she needed to care for her son (Tr. 178).

On December 10, 2001, Behzad Aalaei, M.D., examined Ms. Plantenga and noted that her straight leg raising was positive on the right and negative on the left (Tr. 278).  His diagnosis was consistent with lower back pain and myofascial pain syndrome (Tr. 277).

On February 1, 2002, Dr. Chua examined Ms. Plantenga and stated that she was still complaining of back pain, which was worsened by extension and flexion (Tr. 212). Her pain was rated 10/10 and she suffered from moderate to severe degeneration at L4-5 and L5-S1 (Tr. 212). Dr. Chua opined that these findings seemed to indicate symptomatic lumbar degenerative disc disease (Tr. 212).

On April 17, 2002, Robert O. Bigler, M.D., performed an Intra-discal electrothermal disc decompression (IDET), nucleotomy and annuloplasty (Tr. 145). After several failed attempts, the procedure was finally successful (Tr. 145).

On June 25, 2002, Dr. Bigler saw Ms. Plantenga again, who stated that she was experiencing improvement (Tr. 169). She complained of some stiffness in the morning but otherwise had not significant tenderness across her back or pain associated with extension or flexion (Tr. 169).

On August 20, 2002, Ms. Plantenga visited Dr. Bigler for a post-procedural visit. Ms. Plantenga was proceeding through the IDET therapy and was progressing well; however, subjective pain levels had returned to a 7/10. Dr. Bigler recommended that Ms. Plantenga be released to work, although noting that it should begin at part-time work with a gradual increase in hours (Tr. 235).

On December 3, 2002, Dr. Bigler noted that Ms. Plantenga had still not been released to work and was beginning to "investigate" occupational rehabilitation (Tr. 237).

On December 13, 2002, Dr. Bigler opined in a letter that his prognosis for Ms. Plantenga was "guarded" and that if she were to work it would need to be a job that allowed her to change positions frequently because she experienced difficulties sitting for longer than one hour (Tr.

4

225).  Finally, Dr. Bigler stated that Ms. Plantenga was totally unable to work at that time (Tr. 238).

On December 20, 2002, an MRI was taken of Ms. Plantenga's thoracic and lumbar spine. It showed degenerative disc disease most pronounced at L5-S1.  The thoracic examination was normal (Tr. 160).

On April 29, 2003, Dr. Bigler injected into the greater trochanteric bursa bilaterally.  His diagnosis was consistent with bursitis of greater trochanter (Tr. 493).

From May 8 to May 12, 2003, Ms. Plantenga underwent an instrumented posterior lumbar interbody fusion with the use of minimally invasive procedures.  The diagnosis was degenerative disc disease (Tr. 430).

On May 20, 2003, Ms. Plantenga entered the Emergency Room complaining of back pain. An X-ray of the lumbar spine was normal.  The diagnosis was acute low back pain which was complicating the recent surgery (Tr. 439-41).

On September 17, 2004, David G. Jarmon, M.D., conducted a psychological evaluation of Ms. Plantenga and noted that she had a normal IQ.  His diagnosis was Depressive Disorder, not otherwise specified (Tr. 405).  She had a Global Assessment of Function (GAF) score of 75/75. Further, Dr. Jarmon stated that there were no psychological limitations keeping Ms. Plantenga from engaging in normal work activities (Tr. 412).

<u>Hearing Testimony</u>

At the first hearing on July 13, 2004, Ms. Plantenga testified that she was afflicted with ADHD and that what little time she was able to spend on a stationary bike was rife with pain (Tr. 679, 683).  She was working approximately ten hours per week and was in pursuit of a

kindergarten teacher's license; however, she was unable to sit through the classes and thus, was unable to get her license (Tr. 687, 689).

Ms. Gail Corn, vocational expert, testified that according to the residual functional capacity finding of the ALJ, Ms. Plantenga had over 5,000 jobs open to her in the Indiana economy (Tr. 702).

During the supplemental hearing requested by Ms. Plantenga on February 17, 2005, Ms. Plantenga's friend, Margo Klinker, noted that Ms. Plantenga had been a hard worker before the onset of the back pain and that she had been through some trying economic circumstances, which had prompted her to give Ms. Plantenga the job at the nursery, even though she was well-aware of the limitations on Ms. Plantenga's physical abilities (Tr. 716-7).

<u>The ALJ's Findings</u>

The findings of the ALJ are as follows:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(j) of the Social Security Act and is insured for benefits through December 31, 2001.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

3. The claimant's status post tailbone fracture is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally

credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: sedentary level work, with the following restrictions: ability to alternate into a sitting or standing position at his or her option for periods of one to two minutes per hour; no kneeling, crawling, or climbing of ropes, ladders or scaffolds; no walking on uneven surfaces; no work at unprotected heights, around dangerous machinery, or operating a motor vehicle, or being around open flames or large bodies of water; only simple and repetitive work.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual" (20 CFR § 404. 1563).

9. The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a receptionist, 1500; general office clerk, 1,000; assembler, 2,000; inspector, 500.

13. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

ALJ's Decision

It is the decision of the Administrative Law Judge that, based on the application filed on December 26, 2002, the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(*I*) and 223, respectively, of the Social Security Act."

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel,* 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Williams v. Apfel,* 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000). *See also, Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). However, the district court is

required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### III. Discussion

"Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th.Cir.1998). Under section 423(c)(1)(B)(1), it is well established that to receive benefits, a disability must have begun or had its inception during the period of insured status. *Bolinger v. Barnhart,* 446 F. Supp. 2d 950, 954 (N.D. Ind. 2006) (citing *Bastian v. Schweiker*, 712 F.2d 1278, 1280 (8th Cir. 1983). A claimant has the burden of establishing that she is disabled within the meaning of the Social Security Act on or before the date her insured status expired. *Estok*, 152 F.3d at 640; *Meredith v. Bowen*, 833 F.2d 650 (7th Cir.1987); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir.1985); *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984); *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th Cir.1971). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds,* 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v. Schweiker*, 555 F.Supp. 651, 654 (N.D. Ind.1982). Plaintiff bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir.1976) *(*citing*, Jeralds,* 445 F.2d at 38-39).

The claimant must show that she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520*).* The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger*, 446 F. Supp. 2d at 955.

Ms. Plantenga asserts that the ALJ's residual functional capacity determination was flawed because it was not supported by substantial evidence; she provides two reasons for this supposition. First, she notes that the ALJ failed to analyze and critique the evidence of five visits to Dr. Aalaei, a pain management doctor (Pl. Br. at 22). As a result of this oversight, Ms. Plantenga avers that the ALJ's decision should be remanded for further proceedings (Pl. Br. at 23).

However, while this result would comport with Ms. Plantenga's desires for this appeal, it does not comport with the law in this area. Indeed, the ALJ must merely "build an accurate and logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811. The ALJ has accomplished that here. To be sure, Ms. Plantenga would reach a different result, but that is not

10

the test to be applied.  Indeed, even this court's review is limited to whether there was substantial evidence, a very minimalist standard, to support the ALJ's decision.

The ALJ examined the evidence before him and fashioned the logical bridge; the mere presence of a modicum or even substantial evidence to support a different point of view (a question this court avoids asking) does not necessitate remand or reversal.  *See, Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620 (1996) (noting that the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

Second, Ms. Plantenga notes that the ALJ used Dr. Jarmon's report in his findings; however, Ms. Plantenga asserts, Dr. Jarmon's report was flawed because it was based on an imperfect rendering of the MMPI-2 test (Pl. Br. at 23-4).  Ms. Plantenga was allowed to take the test home with her and thus, performed significantly different than she might otherwise have done, according to her reasoning.  It was the MMPI-2 test that caused the ALJ to question Ms. Plantenga's credibility, according to her, and therefore, since it was flawed, it should not have been used in the determination.

However, this assertion misses the broader point.  Dr. Jarmon relied on much more than the MMPI-2 test in making his observations–he noted Ms. Plantenga's demeanor and answers to several questions during their personal interview and he took into account her patient history (Tr. 401-5).  Furthermore, the ALJ himself cited several pieces of evidence to bolster his ruling, including Ms. Plantenga's daily activities and her treatment history (Tr. 25).  This is not a case where one piece of evidence can become the touchstone for a change of verdict; rather, this is a case in which the ALJ's decision need only be bolstered by substantial evidence.  Thus, even if

11

there are pieces of evidence which run contrary to the ALJ's reasoning, these need not necessitate reversal.

Therefore, because the ALJ's residual functional determination was supported by substantial evidence, the determination is upheld.

### IV.  Conclusion

It should be noted in conclusion that again, the purview of this court's review is constricted by nature and that the court will not engage in independent re-weighing of the evidence or re-decide credibility determinations.  *See, Williams*, 179 F.3d at 1071-2.  The purpose of this court's review of the ALJ's decision is to be sure that it comports with and is supported by substantial evidence.  Therefore, since the ALJ's decision was supported by substantial evidence, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED.**

**Date: April  17 , 2007**                                          S/ ALLEN SHARP
                                                    **ALLEN SHARP, JUDGE**
                                                    **UNITED STATES DISTRICT COURT**